UNITED STATES v. EGRY REGISTER Co.

No. 5035.—Invoice dated Toronto, Canada, July 2, 1937. Entered at Dayton, Ohio, July 19, 1937. Entry No. 23.

Third Division, Appellate Term

(Decided October 18, 1940)

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.
*Toulmin & Toulmin* (*H. A. Toulmin* of counsel) for the appellee.

Before CLINE, EVANS, and KEEFE, Judges; EVANS, J., not participating

KEEFE, Judge: This is an application filed by the Government for the review of a decision rendered by a single judge in Reap. Dec. 4690, 3 Cust. Ct. 656.

The facts presented before the court below disclose that the Egry Register Co. of Dayton, Ohio, the appellee herein, entered into three contracts with the firm of F. M. Scudds, Ltd., of Toronto, Canada, for the manufacture of three printing presses to be built to such specifications furnished by the appellee as would meet their particular requirements. Each contract provided for the manufacture, sale, and delivery of one rotary offset press at a price of $11,666, f. o. b. Dayton, duty and all shipping charges and taxes to be paid by the seller. The contracts were identical in character except that each provided for a different sized cylinder, to wit, 17-inch, 22-inch, and 28-inch.

Work commenced upon the machines on January 11, 1937. Delivery of the first machine was to be made on May 1st, the second on June 1st, and the third on July 1st. A sum of $2,000 was paid upon each contract in advance on the date of the execution of the contracts. Later, the appellee advanced to Scudds, Ltd., as the work progressed, certain sums for wages and materials, to wit, $8,363.77 and a cash loan of $1,000 not connected with the execution of the contracts, or a total of $15,363.77. Scudds, Ltd., became financially involved, and when they failed to deliver the first machine according to contract the appellee company, upon investigation, decided it was to its interest to salvage whatever of the products had been produced. It was established at this time in conversations between the appellee and S. L. Wright, secretary and treasurer of Scudds, Ltd., that $8,500 represented the price of one printing press, f. o. b. factory, and that as it would require about $2,500 additional work thereon to completely finish the 17-inch press, the value thereof, as turned over to the appellee, was $6,000 and further, that, as the miscellaneous parts of the other two machines were not worth any more than their scrap value, $500 would represent such scrap value thereof. The merchandise was therefore invoiced and entered at the values thus placed thereon by S. L. Wright and certain patterns were also included in the invoice, although no value was given therefor.

When the material came before the appraiser an investigation was ordered and as a result thereof the printing machinery and parts

were appraised at $18,437.74, Canadian currency, upon the basis of the cost of production, and the moulders patterns were appraised at an additional sum of $355.69, Canadian currency, making a total appraised value of $18,793.43.

At the trial below considerable testimony was adduced upon behalf of the appellee herein establishing the conditions under which the importation was made and the circumstances leading up to the fixing of the invoice and entered prices. It was further disclosed that the pay rolls of Scudds, Ltd., insofar as they applied to the work of the plaintiff, had been "padded" by Scudds, Ltd., although it was impossible to discover the extent thereof. However, one workman, John Darby, signed an affidavit, admitted in evidence, to the effect that he had been paid $209 out of funds supplied by the appellee for work performed upon articles not connected with the Egry Register Co.'s contract.

A cost accountant connected with the firm of Price Waterhouse & Co. testified that he investigated for the appellee the cost of production of the incomplete printing press and parts imported herein, and during his investigation discovered that the pay rolls had disappeared and therefore he was unable to determine exactly the cost of production. From the ledger accounts he was able to determine that the Egry Register Co. had disbursed to Scudds, Ltd., an amount of $15,406.47 which included a loan of $1,000 not connected with the work in progress. In deducting that sum, together with an amount of $42.70 paid for other work not connected with the press contracts, and $315.68, a proportion of wages paid to H. F. and F. M. Scudds considered applicable to work other than the Egry contracts, and $400 in salaries in May and June, also considered not to be disbursements in connection with the Egry contracts, the accountant found that the total advances in connection with the press contracts were $13,947.75. The accountant also reported from his investigation that out of the $6,000 paid by the Egry Register Co. upon the signing of the contracts he had found that $2,382.41 had been used by Scudds, Ltd., for other purposes, and therefore the total disbursements of the appellee in connection with the manufacture of the three printing presses was $11,565.34.

In reference to the disappearance of the pay rolls, the appellee's representative inquired of Treasury Representative F. R. Thropp, located in Toronto, Canada, relative to any records seized by said Thropp in connection with his investigation, and specially mentioned the pay rolls. The Treasury representative denied that he had the pay rolls in his possession. It developed that the Government at the trial had a report signed by said Thropp which had attached thereto as Exhibits N-1, N-2, and N-3, the particular pay rolls of Scudds, Ltd., which he denied were in his possession, and also many other

bills and records of Scudds, Ltd. In order to have these records before the court the appellee moved the report and records attached thereto in evidence as exhibit 11. The Government also moved in evidence two additional reports of the Treasury representative.

Upon consideration of the evidence before him the trial judge found that the entered value represented the fair value of the merchandise and that such value was the foreign or export value thereof. The Government appealed, assigning error substantially as follows:

First, that the court erred in finding that the entered value represented the fair market value of the merchandise for the reason that there is no provision in section 402 of the Tariff Act of 1930 establishing a basis for such value.

Second, that section 402 defines "value" for the purposes of the statute, and the court is directed in section 501 to determine such value from the evidence presented at the trial, and that the trial court, in holding that, because of the nature of the importation, an offer for sale to all purchasers in the ordinary course of trade, in the usual wholesale quantities in the principal markets of the country, was not feasible, the ascertainment of a fair market value was the most equitable method of determining the export value, was contrary to law.

Upon consideration of the evidence and the numerous exhibits presented before the court below and upon hearing argument of counsel, we find that the trial court erred in holding that a fair market value for the merchandise represented the foreign or export value, and, further, that the finding of such value is contrary to the definition thereof in section 402.

It is clear from the evidence that the Government in denying access to the pay rolls and other records prevented the Egry Register Co. from obtaining evidence relative to the cost of production of the merchandise. It is equally clear that the cost of production which formed the basis of the appraiser's finding of value is erroneous because the labor and material costs used by the appraiser in his finding are not truly representative of the actual costs of the merchandise imported.

From a careful consideration of the voluminous record before us we find the following facts which tend to establish the cost of production of the merchandise in the condition imported.

The cost of materials, according to the findings of the Treasury representative was $5,132.93. We do not agree with his figures because an examination of the bills and accounts disclose bills totaling $2,034.70 which bear no proof whatever of being connected with the work of constructing the presses. Other bills, however, amounting to $3,098.23 are identified as representing the cost of purchased merchandise for work upon the three presses under construction.

An inspection of the three pay rolls in evidence discloses that pay roll marked N–1 has reference to the hours of labor of all the workmen in the factory of Scudds, Ltd., from January to June 30, 1937, irrespective of the particular work upon which the workmen were engaged; that pay roll book marked N–2 lists the amount of labor expended upon the Egry Register Co.'s contracts during the months of May and June; and that pay roll book marked N–3 purports to be a record of the time consumed in working upon the Egry Register Co.'s contracts from January to June inclusive. The total pay roll of the factory during the months the work upon the presses in question was in progress amounted to $8,812.41. The cost of labor applied to work upon said printing presses was $5,897.61. These amounts do not include sums paid to H. F. and F. M. Scudds or to S. H. Wright. The total amount paid to H. F. and F. M. Scudds was $2,145, and such sum purported to represent the costs of designing the machines and general supervision of construction. Wright received $1,300 in installments of $50 per week for 26 weeks as the estimated proportionate overhead expenses of the factory. Thus from our observation the total labor cost shown to have been due the company does not exceed $8,042.61.

Considering first the $1,300 paid to Wright, we find that the overhead expenses of the factory for the period of the contract were $3,483.51. The Egry contracts increased the output of the factory by approximately two-thirds. In that proportion the overhead to be apportioned to the plaintiff would amount to $2,322.24. However, we also find that the overhead for the preceding 6 months was $3,331.19, only $152.32 less than during the period of the contract with the Egry Register Co., and it would seem that $1,300 would be an undue proportion as applied to Egry work. But in figuring the overhead for the eight periods of 6 months immediately preceding the period in question, we find that the average was $2,452.59 and the increase in overhead expenses during the period in question is a trifle less than one-third. Accepting one-third of the overhead as applying to the work for the Egry Register Co., the proper sum to be applied for general expenses and overhead is equal to $1,161.17, which is more than the 10 per centum minimum prescribed in the statute.

In reference to the sums taken by H. F. and F. M. Scudds for designing the three presses and for general supervision of construction, we must take into consideration that during the period in question three presses were to be designed and constructed and delivered, where, as a matter of fact, only one press was two-thirds constructed. It becomes self evident therefore that the amount of $2,145 is all out of proportion to the finished product. Had three presses been designed and delivered the sum paid would be equivalent to $715 per printing press. As the result of the designing and supervision

of H. F. and F. M. Scudds there was a failure to produce a finished product. Consequently we are of the opinion that any sum paid for the work of these two men would be excessive.

Considering the charges for labor applicable to the presses, we find evidence tending to establish that the secretary and treasurer of the company padded the company's pay rolls and charged the appellee for labor not connected with the manufacture of the presses. However, the only credible evidence before us appears in the affidavit of John Darby who actually received $209 from the Egry Register Co. for work performed upon articles not connected with the work upon the printing presses. Therefore, from the books of Scudds, Ltd., however erroneous they might appear, we are constrained to find that the labor applicable to the manufacture of the press imported and the miscellaneous spare parts is $5,897.61, less $209, or $5,688.61.

In respect to the profit, the evidence fails to disclose that any sums may be segregated to cover that item. Inasmuch as the statutory definition of value upon the cost of production basis requires that a minimum of 8 per centum of the costs of labor and materials shall be found for profit, we find that the profit applicable to the cost of production of the merchandise in question is $702.95.

We summarize our findings of the cost of production of the printing press, partly manufactured, together with the spare parts and molders' patterns, as follows:

| | |
|---|---|
| Cost of materials | $3,098.23 |
| Cost of labor | 5,688.61 |
| General expenses | 1,161.17 |
| Profit | 702.95 |
| Canadian | 10,650.96 = Cost of production |
| Plus packing | 23.26 |
| Canadian | 10,674.22 |

Unfortunately, $10,650.96 Canadian currency determined to be the cost of production of the press in question represents the cost of production not only of the unfinished machine in question but also of the miscellaneous parts of three machines contracted to be delivered by Scudds, Ltd., and which were imported by the appellee upon the theory that such parts represented scrap metal only. However, there is no evidence relative to the proportion of labor and materials entering into the cost of the parts in question, and there is no evidence of foreign or export value for such articles, we are constrained to hold that the value thereof is included in the cost of production heretofore determined, which we further hold includes the item of molders' patterns.

For the reasons heretofore expressed the decision of the trial court is hereby reversed, and judgment will be entered upon the basis of the cost of production as shown in the foregoing summary.